**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL A. PETRY, | ) | CASE NO. 3:12-CV-2655 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Michael A. Petry ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying

his applications for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a), and Period of Disability ("POD") and

Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 416(i), 423.

This case is before the undersigned United States Magistrate Judge pursuant to the

consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the

reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On December 16, 2010, Plaintiff filed his applications for SSI, POD and DIB,

alleging a disability onset of March 1, 1995.  (Transcript ("Tr.") 11.)  The application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

---

[1]   On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of
Social Security.  She is automatically substituted as the defendant in this
case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

administrative law judge ("ALJ").  (*Id*.)  On February 28, 2012, an ALJ held Plaintiff's hearing.  (*Id*.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id*.)  A vocational expert ("VE") also participated and testified.  (*Id*.)  On June 8, 2012, the ALJ found Plaintiff not disabled.  (Tr. 11-2.)  On August 29, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On October 24, 2012, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 17, 18.)  Plaintiff argues that – for several reasons – substantial evidence does not support the ALJ's determination of his residual functional capacity ("RFC"), that the ALJ erred in relying on the VE's testimony regarding the availability of jobs, and that the ALJ erred in failing to address Plaintiff's prior application for benefits.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on November 9, 1962.  (Tr. 234.)  He obtained a GED and completed a truck driving course.  (Tr. 43.)  He worked as a landscaper in 1994, and thereafter cared for his elderly parents.  (Tr.45.)

### B.    Relevant Medical Evidence

#### 1.    Treatment Notes

On January 7, 2007, Plaintiff reported to staff at the Fisher Titus Medical Center ("Fisher Titus") emergency department that he had injured his back the day before while

2

"helping his boss move."  (Tr. 435.)  Plaintiff complained of throbbing pain in his lower back, rated at an eight out of 10.  (*Id*.)  A physician diagnosed Plaintiff with back strain and prescribed Anaprox and Flexeril.  (*Id*.)

On November 14, 2010, Plaintiff reported to the Fisher Titus emergency department, complaining of central lumbar back pain after falling and landing flat on his back the day before.  (Tr. 445.)  An x-ray of Plaintiff's lumbosacral spine showed mild hypertrophic spurs, but was otherwise negative.  (Tr. 449.)  A physician diagnosed Plaintiff with low back pain, and prescribed Robaxin, Naprosyn and Vicodin.  (Tr. 447.) On December 14, 2010, Plaintiff returned to Fisher Titus, stating that he had aggravated his back pain by shoveling snow the night before.  (Tr. 450.)  He reported that twisting his back exacerbated his pain.  (Tr. 451.)  A physician diagnosed Plaintiff with low back pain, and prescribed Naprosyn, Valium and Vicodin.  (Tr. 452.)

On January 3, 2011, Plaintiff reported to the Fisher Titus emergency department, complaining of low back pain.  (Tr. 454.)  A physician diagnosed Plaintiff with chronic low back pain and prescribed Vicodin, Flexeril and Prednisone.  (Tr. 455.)

On January 13, 2011, Plaintiff reported to the emergency room at Firelands Regional Medical Center ("Firelands"), complaining of back pain.  (Tr. 466.)  He stated that he had fallen the previous November and had been experiencing chronic back pain since then.  (*Id*.)  Plaintiff reported that he could not follow up with a physician because he had no insurance.  (*Id*.)  Plaintiff stated that he smoked a pack of cigarettes per day. (*Id*.)  A physician diagnosed Plaintiff with low back pain; prescribed Flexeril, Motrin and Ultram; and referred Plaintiff to the family practice clinic.  (Tr. 467.)

On January 18, 2011, Stacy L. Carpenter, D.O., examined Plaintiff, who

3

complained of constant mid-line back pain following a fall the prior November.  (Tr.
558.)  He stated that he had fallen over a lawn mower that he was loading into a trailer.
(*Id*.)  He reported smoking a pack of cigarettes per day.  (*Id*.)  Dr. Carpenter prescribed
Vicodin.  (Tr. 558-59.)

A January 20, 2011 MRI of Plaintiff's lumbar spine revealed: mild degenerative
disk narrowing at T11-T12 with mild asymmetrical left paracentral anular bulging;
moderate anterior osteophytosis at T12-L1; mild degenerative disc narrowing at L3-L4
with mild disc desiccation; facet joint arthritis at the left L3-L4; moderate disc
desiccation, broad-based anular bulging, narrowing and facet joint arthrosis at L4-L5;
and mild central anular bulging and mild facet joint arthrosis at L4-L5.  (Tr. 469.)

On February 9, 2011, Dr. Carpenter noted Plaintiff's report of back pain
accompanied by numbness and tingling in his left lateral thigh.  (Tr. 556.)  The pain
occurred with standing and was alleviated by sitting.  (*Id*.)  Dr. Carpenter prescribed
Prednisone and instructed Plaintiff to continue taking the Vicodin.  (*Id*.)  On February
22, 2011, Plaintiff continued to complain to Dr. Carpenter of back pain, noting that it
was decreased when he was flexed and leaning to the right.  (Tr. 554.)  Dr. Carpenter
noted that she intended to refer Plaintiff to a neurosurgeon, noting that Plaintiff's MRI
revealed multiple disc herniations and that Plaintiff was "miserable."  (Tr. 554-55.)

On March 21, 2011, physical therapist Christopher Schaeffer performed a
functional capacity evaluation on Plaintiff.  (Tr. 473-81.)  He noted Plaintiff's report of
previously working as a landscaper.  (Tr. 473.)  Although Plaintiff exhibited a decreased
range of motion in his lumbar spine, his range of motion was otherwise within normal
limits.  (Tr. 474.)  Testing suggested that Plaintiff "may not have given maximum effort

with the testing," but was reliable with respect to reporting his pain.  (Tr. 475, 476.)

Planitiff complained of functional pain rated at an 8 out of 10, and reported that he had

experienced pain rated at a 10 out of 10 in the prior 30 days, with his "best pain level"

rated at a 5 to 6 out of 10.  (Tr. 477.)  Plaintiff exhibited lower than average grip

strength in both hands.  (Tr. 478.)  Plaintiff rated his pain at an 8 of 10 with sitting and a

9 with standing, kneeling, walking and step climbing.  (Tr. 479-80.)  He was unable to

crouch, crawl or perform the lifting, push-pull and carrying tests due to pain.  (Tr. 479-

80.)

The physical therapist opined that Plaintiff could occasionally lift, carry, sit, walk,

climb stairs, balance, work above his shoulders, kneel and rely on fine or medium hand

dexterity.  (Tr. 481.)  He concluded that Plaintiff could stand for up to 10 minutes at a

time.  (*Id.*)

On March 22, 2011, Plaintiff reported to Dr. Carpenter that his back pain

continued.  (Tr. 552.)  Dr. Carpenter noted that Plaintiff was scheduled to see a

neurosurgeon later that month.  (*Id.*)  On May 24, 2011, Plaintiff reported that he had

rescheduled his appointment with the neurosurgeon for June 2011.  (Tr. 548.)  He

continued to report severe low back pain that was alleviated by leaning forward.  (*Id.*)

Dr. Carpenter continued Plaintiff's Vicodin and instructed him to keep the appointment

with the neurosurgeon.  (*Id.*)  On March 29, 2011, Dr. Carpenter completed a form

entitled "Physician Certification of Medication Dependency for the Disability Assistance

Program," in which she noted that Plaintiff had "significant back pain, preventing him

from daily activities," and that he could "not even sit up straight without shooting pains."

(Tr. 492.)

5

On May 25, 2011 neurosurgeon Azedine Medhkour examined Plaintiff.  (Tr. 535.)
He noted Plaintiff's report that he smoked one and one-half packs of cigarettes per day,
and described Plaintiff as "moderately obese."  (*Id*.)  Dr. Medhkour noted that Plaintiff's
gait was normal, and that Plaintiff's sensory exam was within normal limits.  (*Id*.)  He
observed that the MRI of Plaintiff's lumbar spine showed multilevel degenerative disc
disease with no obvious nerve root compressions.  (*Id*.)  Dr. Medhkour advised Plaintiff
to lose weight and stop smoking, and instructed him on the care of his back.  (*Id*.)

Dr. Carpenter noted Plaintiff's ongoing complaints of chronic, severe, low back
pain in June 2011 and August 2011.  (Tr. 544, (August 1, 2011), 546 (June 29, 2011).)
On September 1, 2011, Plaintiff reported that his left leg was growing numb at night and
that his back pain was increasing.  (Tr. 542.)  He was scheduled to see a pain
management physician the following week.  (*Id*.)  Dr. Carpenter continued Plaintiff's
Vicodin.  (Tr. 542-43.)

On February 11, 2012, Plaintiff reported to Fisher Titus complaining of low back
pain, left thigh pain and numbness in his left foot.  (Tr. 561.)  Physicians diagnosed
Plaintiff with arterial occlusion and admitted him.  (Tr. 565.)  Plaintiff was treated with
aortic, iliac and femoral angiography.  (Tr. 577.)  Plaintiff was discharged on February
14, 2012.  (Tr. 568.)

### 2.    Agency Reports

On April 4, 2011, agency consultant Thomas M. Evans, Ph.D., examined
Plaintiff.  (Tr. 515-19.)  He opined that Plaintiff was not impaired in his ability to
concentrate and pay attention to tasks, and to understand and follow simple, repetitive

6

directions.  (Tr. 518.)  He concluded that Plaintiff's ability to withstand stress and pressure was moderately impaired.  (*Id*.)  He diagnosed Plaintiff with adjustment disorder with depressed mood.  (Tr. 519.)

On March 19, 2012,[2] Sushil M. Sethi, M.D., performed a consultative examination.  (Tr. 587-600.)  He noted Plaintiff's report that he continued to smoke one and one-half packs of cigarettes per day, and "had not made a real good effort" at quitting.  (Tr. 587.)  Plaintiff was not using any ambulatory aids, and was able to walk on his heels and tiptoes, and could squat.  (Tr. 588.)  Plaintiff's gait was normal.  (*Id*.)  Dr. Sethi noted diffuse, moderate tenderness in Plaintiff's lumbar spine, but no muscle spasm or guarding.  (Tr. 589.)  Dr. Sethi opined that Plaintiff's ability to perform work-related physical activities was "limited to medium labor," and that Plaintiff could: sit for four to six hours, stand for two to three hours, walk for three to four hours in an eight-hour shift, frequently carry 20 to 25 pounds and occasionally carry 30 to 50 pounds. (*Id*.)  Testing revealed a decreased range of motion in Plaintiff's lumbar spine.  (Tr. 593.)

**C.  Hearing Testimony**

**1.  Plaintiff's Hearing Testimony**

At his February 28, 2012 hearing, Plaintiff testified as follows:

He was 49 years old on the date of the hearing.  (Tr. 42.)  He had obtained a GED and, in 2008, had completed a truck driving course.  (Tr. 43.)  He was living in a friend's trailer.  (*Id*.)

---

[2]    After his February 28, 2012 administrative hearing, Plaintiff underwent a consultative examination at the request of the ALJ.  (Tr. 59-60, 97.)

Plaintiff last worked in 1994, when he worked as a landscaper.  (Tr. 45.) Thereafter, he took full-time care of his parents until his father passed away in 2004. (*Id.*)  His mother had recently moved into an assisted living facility.  (*Id.*)  In 1995, he injured his back lifting a transmission, but the pain had never been significant enough for him to seek disability.  (*Id.*)  After his 1995 back injury, he didn't work full time, and "couldn't do a lot of lifting" while taking care of his parents.  (Tr. 46.)

In November 2010, he fell on a "straggler" and since then was "hardly able to walk."  (Tr. 45.)  Plaintiff was able to drive, and had a commercial drivers license, but did not drive a lot.  (Tr. 46-47.)  Plaintiff was in constant pain, which was relieved only by sitting and leaning to the right, or by lying down.  (Tr. 47.)  Plaintiff took Percocet every day.  (*Id.*)  His back pain was exacerbated by any activity, including walking, standing and bending.  (Tr. 49.)  Plaintiff could not sit up straight without pain.  (*Id.*) Plaintiff felt that he could walk on block, stand for five to 10 minutes, and sit for 15 minutes without pain.  (Tr. 50.)  Any lifting caused Plaintiff's back to hurt.  (Tr. 51.)

Plaintiff used a shower chair because he had once fallen in the shower.  (*Id.*) Although he was capable of dressing himself, it took some time.  (Tr. 52.)  Plaintiff slept for three to four hours at a time.  (Tr. 53.)  His day generally consisted of "sit[ting] on the love seat leaning to the right or [lying] around reading books, watching TV."  (*Id.*) Plaintiff's friend did most of Plaintiff's chores, including laundry and dishes, and took him to the grocery store.  (Tr. 54.)  Plaintiff had started using a cane to walk; however, it had not been prescribed by a physician.  (Tr. 56.)  Plaintiff had experienced muscle spasms in his back and upper legs at night and when he sat for a long period of time.

8

(Tr. 57.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ described the following hypothetical individual to the VE:

> [P]lease consider an individual of [Plaintiff's] age, education and past work who's able to perform light work . . . who is further limited to . . . no more than occasional climbing ladders, ropes, or scaffolds.  And work with no production rate or pace, fast pace, and I would define that as an externally driven production rate as in a line or . . . something . . . where the individual is expected to keep up with an externally driven pace.

(Tr. 66.)  The VE opined that the hypothetical individual could perform work as: (1) a storage facility rental clerk, which was title number 295.367-026 in the Dictionary of Occupational Titles ("DOT"), and of which there were 200 to 250 positions in Plaintiff's home area of Ohio economic development region six, 16,000 at the state level, and 420,000 nationally; (2) an office helper, DOT number 239.567-010, of which there were approximately 300 to 350 positions in the relevant region, 3,000 at the state level and 110,000 nationally; and (3) a repack room worker, DOT number 920.687-042, of which there were 450 to 500 positions in the relevant region, 50,000 at the state level and 710,000 nationally.  (Tr. 66-67.)

The ALJ posed several other hypotheticals, and in response to the fourth hypothetical, which limited the individual to sedentary work, the VE testified that the hypothetical individual could work as a spotter, sorter or final assembler.  (Tr. 70.)  Finally, the ALJ asked, "if an individual were only able to stand for 10 minutes during the course of an eight-hour workday and w[as] only [able] to sit for approximately one third of that day, are there any jobs such an individual could perform?"  (Tr. 71.)  The

ALJ testified that an individual with those limitations would not be able to sustain full-time employment.  (*Id*.)

Plaintiff's counsel questioned the VE regarding how she calculated the number of positions available for each occupation she identified in response to the ALJ's various hypotheticals.  The VE explained that she had considered representative occupations that matched the ALJ's limitations:

> Q:   You mentioned the incidents of jobs in the occupations that you named.  And when you gave the incidents figures, you said there are X number of . . . that kind of position.  Were the numbers you gave for those specific DOT titles as described in the DOT?
>
> A:   No, they're representative of the positions that match the description.
>
> Q:   When you say match the description, you don't mean the description of the individual DOT titles in the DOT, you mean some larger category of work?
>
> A:   They match the hypotheticals posed by the judge.
>
> Q:   All right.
>
> A:   In that – the physical demands that were presented in each hypothetical, the DOT codes that I indicated represent the jobs that would be possible in those hypotheticals.

(Tr. 72-73.)  The VE further explained that, when she testified regarding the number of positions available for a particular occupation, that number included positions that were available in other occupations contained in the same Standard Occupational Classification ("SOC") group, that also matched the ALJ's hypothetical.  (Tr. 74-75.)

In response to questioning regarding her response to the ALJ's fourth hypothetical, the VE explained that she had compared the limitations in the hypothetical

to the characteristics of occupations listed in a particular SOC group, and based her

testimony regarding the number of available positions on that analysis:

> Q:     Approximately how many other DOT titles are
> included in those incidents figures that you gave us?
>
> A:     It varies depending on the S[pecial] V[ocational]
> P[rofile] ("SVP") and the physical demand levels of
> each.
>
> Q:     Do you know for the three occupations that you
> mentioned, how many other occupations that you did
> not name are included in the incidents figures?
>
>                                    *  *  *
>
> A:     Well, there's some math involved, but it's for the
> spotter position . . . in that big, or larger job group in
> the Ohio employee statistical survey, there are 781
> matching job titles.  But of those, not all of them are
> sedentary and unskilled. With those, those are the
> ones that were used to identify the availability of
> those jobs.
>
> Q:     You mentioned 781 matching titles.
>
> A:     Not matching titles, in that group.
>
> Q:     Okay.
>
> A:     There are 781 job titles, or DOT code numbers.
>
> Q:     All right.
>
> A:     However, there are very few sedentary and unskilled
> jobs, which constitute the . . . incidents . . . of these
> positions [t]hat I offered during my testimony.

(Tr. 74-75.)

      Plaintiff's counsel asked the VE whether she had "proportionally" reduced data

that was applicable to all occupations in the relevant SOC group to determine the

number of available positions that matched the ALJ's hypothetical, and the VE

explained that she performed a more detailed analysis to arrive at her testimony

regarding the number of available positions:

> Q:    But the data you used are for all 781 titles and then
> you reduce proportionally to the fraction of those
> occupations that are sedentary and unskilled, is that
> correct?

> A:    No, not directly.  What I do is I identify a local region
> demographic.  So in this case it was economic
> development region 6 of Ohio. . . . I look at the
> populations, major industry, major employers.  Then I
> look at the [SOC] classification system.  I look at the
> major groups of occupations.  For example,
> management, education, protective services.  Then I
> break that down into Bureau of Labor statistics, for
> more specific market information including the state
> employment information that I mentioned, and that
> identifies the job titles within that SOC group. . . .  And
> I further look at census bureau information, the
> employment statistics, information from other
> federally published documentation, the occupational
> employment surveys, statistical data that you
> mentioned, as well as the DOT.  And I consider jobs
> by their SVP, or their vocational preparation and
> physical demand level.  And that helps me get down
> to – what I believe is an adequate representation of
> the number of jobs available in that region.

(Tr. 76-77.)

Finally, Plaintiff's counsel asked the whether she could accurately testify

regarding the number of available positions for each DOT number within a specific SOC

group:

> Q:    Wouldn't it take looking at all . . . occupations [within
> an SOC group] and comparing them with your data
> and your experience to determine whether they exist
> in the region and state, and national economy?

12

A:      Yes.

Q:      Are you testifying that you have done that cross
        check or that you have not done that cross check
        about these incident figures?

A:      I have.

Q:      But that – you don't have that data with you?

A:      No, I did it in 2007 and I don't have that specific
        information in front of me.

(Tr. 92-93.)  Plaintiff's counsel requested that the VE produce her data regarding this

issue, and the ALJ instructed him to make a written request.  (Tr. 93-94.)

### 3.      Prior Application Amended On Set Date

At the conclusion of the hearing, the ALJ noted that Plaintiff's file included a prior

application for disability benefits that was filed in September 2009 and initially denied in

November 2009.  (Tr. 99.)

### D.      Post-Hearing Proceedings

On March 1, 2012, Plaintiff filed with the ALJ a request that the ALJ reopen

Plaintiff's previously filed application for SSI, arguing that new evidence showed that

Plaintiff's "condition was worse than it was thought at the time, [Plaintiff] apparently was

unrepresented."  (Tr. 339.)

On that same date, Plaintiff filed with the ALJ a request that the ALJ order the

VE to produce all of the date sources and work sheets supporting her testimony at the

hearing regarding the incidence of jobs that matched the ALJ's hypothetical questions.

(Tr. 340-409.)  Plaintiff argued that the VE's testimony was unreliable because the VE

conceded that she could not estimate the actual number of positions available for the

13

specific occupations she named; rather, she had provided the number of positions available for all occupations that were included in the relevant SOCs.  (Tr. 340-43.) According to Plaintiff, because those SOCs included positions that may not have corresponded to the ALJ's hypotheticals, the VE's testimony regarding the number of available positions was not sufficiently reliable to carry the Commissioner's burden at the final step of the sequential analysis.  (Tr. 342-43.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905

F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

In his February 24, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Act through June 1, 1997.

2.    Plaintiff has not engaged in substantial gainful activity since March 1, 1995, the alleged onset date.

3.    Plaintiff has the following severe impairments: multilevel degenerative disc disease; adjustment disorder with depressed mood; and obesity.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except: no more than occasional climbing ladders, ropes or scaffolds and work with no production rate or fast-paced work (defined as externally driven production rate work such as in a line or where the individual is expected to compete with externally driven pace).

6.     Plaintiff has no past relevant work.

7.     Plaintiff was born on November 9, 1962 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.     Plaintiff has at least a high school education and is able to communicate in English.

9.     Transferability of job skills is not an issue because Plaintiff has no past relevant work.

10.    Considering Plaintiff's age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.    Plaintiff has not been under a disability, as defined in the Act, from March 1, 1995, through June 8, 2012 (the date of the ALJ's decision).

(Tr. 14-28.)  Additionally, the ALJ denied Plaintiff's request for the VE's data, and declined to reopen Plaintiff's prior application for benefits.  (Tr. 11.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

16

1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

Plaintiff argues that substantial evidence does not support the ALJ's decision because: (1) the ALJ failed to mention relevant findings by Dr. Carpenter and Dr. Sethi; (2) the ALJ erred in giving no weight to the functional capacity examination performed by a physical therapist; (3) the RFC does not include limitations that reflect the ALJ's conclusion that Plaintiff was moderately restricted in concentration, persistence and pace; (4) the ALJ based his findings on unreliable testimony from the VE; (5) the decision is inconsistent with respect to whether Plaintiff had limited range of motion or muscle spasms; (6) the ALJ failed to discuss Plaintiff's prior application for SSI; and (7) the ALJ failed to explain why he did not include limitations in the RFC that he included in a hypothetical to the VE.

**1.      The Opinions of Drs. Carpenter and Sethi**

Plaintiff argues that the ALJ erred in failing to discuss portions of the opinions of

17

Dr. Carpenter and Dr. Sethi that are inconsistent with the ALJ's conclusion that Plaintiff is capable of light work.  Specifically, Plaintiff points to Dr. Carpenter's observations that Plaintiff had "significant back pain, preventing him from daily activities" and that Plaintiff could not "sit up straight without shooting pains."  (Tr. 492.)  He also points to Dr. Sethi's conclusion that Plaintiff could stand for two to three hours in an eight-hour shift.  (Tr. 589.)  According to Plaintiff, because each of these opinions is inconsistent with the ALJ's conclusion that Plaintiff was capable of light work, the ALJ erred in failing to discuss them.  Plaintiff's arguments are not well taken.

With respect to Dr. Carpenter, Plaintiff correctly notes that she was his treating physician.  A treating source's opinion is entitled to controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  However, an ALJ may assign a treating source's opinion little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

Here, the ALJ assigned "no weight" to Dr. Carpenter's opinion, noting that she had "failed to identify any basis for" her conclusions, and did not offer "specific

limitations" regarding Plaintiff's abilities.  (Tr. 24.)  He also noted that Dr. Carpenter's

observations regarding the severity of Plaintiff's pain were not supported by medical

records, as an MRI of Plaintiff's back revealed "that his bulging discs were mild in

nature," and that Dr. Carpenter had generally otherwise found Plaintiff to have normal

neurological examinations.  (*Id.*)  The ALJ also observed that Dr. Carpenter "relied quite

heavily on the subjective report of symptoms and limitations provided by [Plaintiff]."  (*Id.*)

 These reasons are all evident in the record in this case.  Accordingly, to the extent that

Plaintiff argues that the ALJ erred in assigning less than controlling weight to Dr.

Carpenter's opinion, that argument fails because substantial evidence supports the

ALJ's conclusion.  Further, because the ALJ assigned "no weight" to Dr. Carpenter's

opinion, he did not err in failing to discuss those portions of it that were inconsistent with

his determination of Plaintiff's RFC.

Plaintiff's argument with respect to Dr. Sethi's opinion also fails.  Plaintiff

contends that the ALJ did not discuss Dr. Sethi's conclusion that Plaintiff was capable of

standing for two to three hours during an eight-hour shift, which precludes Plaintiff from

performing light work.  Plaintiff bases his argument on the definition of "light work,"

which includes "a good deal of walking or standing," 20 C.F.R. § 404.1567(b), and

requires that a claimant be capable of "standing or walking, off and on, for a total of

approximately 6 hours of an 8-hour day."  Titles II and XVI: Determining Capability to Do

Other Work, S.S.R. 83-10, 1983 WL 31251, *6 (S.S.A. 1983).  Here, a review of the

decision reveals that the ALJ addressed Dr. Sethi's opinion that Plaintiff was not

capable of standing for a sufficient period of time to perform light work:

> While Dr. Sethi did not specifically refer to work at a specific

19

> exertional level and regardless of whether his definition
> matched the regulations['] specific limitations, Dr. Sethi's
> conclusions did show that there was a range of standing,
> walking and sitting that did not preclude all work in an eight-
> hour workday.  *Even on the best of days, when considering
> [Plaintiff's] leg, cane usage, ambulation issues, and other
> evidence, the records do not show that he is so limited that
> he would be unable to walk or stand for a combined six hour
> period.*

(Tr. 25.) (emphasis added).  Although the ALJ failed to mention the specific amount of

time posited by Dr. Sethi, by observing that the record did not support a conclusion that

Plaintiff was capable of standing for less than six hours, the ALJ rejected Dr. Sethi's

opinion that Plaintiff was capable of standing for only two to three hours.  Accordingly,

the record does not support Plaintiff's argument on this point.

> **2.      The Functional Capacity Evaluation**

Plaintiff contends that the ALJ erred in assigning no weight to the functional

capacity examination performed by a physical therapist.  Although not an "acceptable

medical source" for the purpose of determining whether a claimant has a medically

determinable impairment, the opinion of a physical therapist "may be based on special

knowledge of the individual and may provide insight into the severity of the

impairment(s) and how it affects the individual's ability to function."  Considering

Opinions and Other Evidence From Sources Who are Not "Acceptable Medical

Sources," S.S.R. 06-03p, 2006 WL 2329939, *2 (S.S.A. Aug. 9, 2006).  In assessing the

opinion of a physical therapist, an ALJ must consider the same factors that apply to the

opinion of an acceptable medical source, which include: the length of time of the

source's relationship with the claimant and how often the source has seen the

20

individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; whether the source has a speciality or area of expertise relevant to the claimant's impairment; and any other factors that tend to support of refute the opinion.  *Id.* at * 4 (citing 20 C.F.R. § 404.1527(d)).

Here, the ALJ assigned "no weight" to the opinion of the physical therapist, observing that the therapist "even noted that [Plaintiff] gave 'sub-maximal' effort with the tests involved in the evaluation."  (Tr. 25.)  Plaintiff argues that, because the report reflects that Plaintiff gave sub-maximal effort only with respect to the strength tests performed by the physical therapist, the ALJ erred in relying on that issue to reject the entire report. However, the ALJ also noted that, "when considering the other medical evidence, including Dr. Sethi's evaluation and range of motion studies, the observations and assessment by [the physical therapist] are not consistent with the record in its entirety."  (*Id.*)  These observations are supported by evidence in the record, and they address factors specifically set forth in the relevant regulations.  Accordingly, Plaintiff's argument on this point lacks merit.

### 3.    Non-Exertional Limitations

At step three of the sequential analysis in this case, the ALJ determined that Plaintiff had moderate difficulties with regard to concentration, persistence and pace. (Tr. 17.)  In his RFC determination, the ALJ assigned Plaintiff the following non-exertional limitation:

> [N]o production rate or fast[-]paced work (defined as
> externally[-]driven production rate work such as in a line or
> where the individual is expected to compete with externally

21

driven pace).

(Tr. 18.)  The ALJ based this limitation on Dr. Evans's conclusion that Plaintiff was moderately impaired in his ability to withstand stress and pressure.  (Tr. 17.)  Plaintiff argues that the RFC does not sufficiently account for Plaintiff's mental limitations because "[n]othing in the psychiatric record suggests that the only stressors that this claimant needs to avoid are 'externally drive' production rates such as an assembly line. No medical source made this finding."  (Plaintiff's Brief ("Pl. Br.") at 7.)

Plaintiff's argument is meritless.  As an initial matter, it is well established that the claimant bears the burden of establishing the impairments – and the severity of those impairments –  that determine his RFC.  *See* Her v. Comm'r of Soc. Sec., 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], *when the claimant is proving the extent of his impairments*.") (emphasis added).  Here, although Plaintiff's argument implies that Plaintiff required further restrictions to avoid additional stressors, he points to no evidence in the record to support that argument.

Further, the record reflects that the ALJ's non-exertional restrictions addressed Plaintiff's non-exertional limitations.  Dr. Evans determined that Plaintiff was impaired in his ability to handle stress and pressure.  He did not assign Plaintiff any other mental restrictions.  The ALJ's RFC precluded Plaintiff from working at a position where he would be exposed to the stress and pressure of satisfying a production quota or maintaining a pace that was determined by factors other than his own speed.  Absent

22

some evidence that Plaintiff had additional limitations in the area of concentration,

persistence and pace, substantial evidence supports the ALJ's calculation of Plaintiff's

non-exertional limitations.

### 4.      The Testimony of the VE

Plaintiff argues that the ALJ erred in relying on the testimony of the VE to

determine that Plaintiff could work in positions that existed in significant numbers in the

national economy.  According to Plaintiff, the VE's testimony regarding the number of

positions available for each occupation she identified in response to the ALJ's

hypotheticals was unreliable.  Specifically, Plaintiff points to the VE's testimony that her

figures for the number of available positions of a specific occupation included positions

in a larger group of occupations with the same skill level and exertional demands as the

jobs she identified in her testimony.  Plaintiff contends that the VE conceded that she

did not know whether some of the jobs in the specific SOC groups actually existed, and

notes that the VE admitted that she would have to specifically review multiple DOT

listings to determine whether those positions actually existed.

The ALJ rejected this same argument in his decision:

> In the case at hand, the testimony of the [VE] is highly
> reliable.  The jobs identified exist in several industries and
> are not of an isolated nature.  The [VE] provided jobs at the
> local/regional level, as well as state and national numbers.
> Such jobs occur in the region where [Plaintiff] lives and
> would not require significant travel to engage in such jobs.
> Therefore, the jobs identified by the [VE] constitute a
> significant number of jobs.
>
> *   *   *
>
> In this particular situation, at Step 5, where examples of jobs
> are considered, the [VE] elaborated that she chose

23

> representative jobs that matched the description of the DOT titles based upon the hypothetical.  Rather than produce broad general classifications, the [VE] provided answers that were based upon specific hypotheticals that included various vocational factors.  Her answer included representative jobs that closely matched the DOT titles.  Based upon her personal observations and expertise, the [VE] was able to discern between the various functional demands and duties required by the [RFC].

(Tr. 27, 28.)

Substantial evidence supports the ALJ's conclusion that the VE's testimony was sufficiently reliable in this case.  As a preliminary matter, Plaintiff points to no legal authority prohibiting a VE from identifying representative occupations in response to an ALJ's hypothetical.  Further, the VE's testimony in this case reflects that she considered the limitations assigned by the ALJ in his hypotheticals when responding to his questions.  Contrary to Plaintiff's characterization of her testimony, the VE did not concede that she was unable to testify "whether jobs in some of the specific occupational titles she mentioned actually exist."  (Pl. Br. at 8.)  Rather, she testified that she was not certain whether <u>one</u> specific occupation within a larger group of occupations existed.  (Tr. 81.)  Further, although the VE did concede that determining whether all of the positions in a specific SOC group existed would require her to consider each individual DOT title within that SOC group, she also testified that she had analyzed the number of available positions for each representative occupation she identified in this case:

> What I do is I identify a local region demographic.  So in this case it was economic development region 6 of Ohio. . . . I look at the populations, major industry, major employers.  Then I look at the [SOC] classification system.  I look at the major groups of occupations.  For example, management,

> education, protective services.  Then I break that down into
> Bureau of Labor statistics, for more specific market
> information including the state employment information that I
> mentioned, and that identifies the job titles within that SOC
> group. . . .  And I further look at census bureau information,
> the employment statistics, information from other federally
> published documentation, the occupational employment
> surveys, statistical data that you mentioned, as well as the
> DOT.  And I consider jobs by their SVP, or their vocational
> preparation and physical demand level.  And that helps me
> get down to – what I believe is an adequate representation
> of the number of jobs available in that region.

(Tr. 76-77.)  Plaintiff does not address this portion of the VE's testimony, which reflects

that the VE relied on her expertise and experience, as well as outside sources and the

economic realities of the specific region, to support her testimony regarding this issue in

this case.   The VE's testimony regarding her method in this case sufficiently supports

the ALJ's conclusion that her testimony was reliable.

Plaintiff also argues that the ALJ erred in declining to require the VE to produce

her research from 2007, when she reviewed all of the DOT titles in a specific SOC

group to determine whether they existed in the national economy.  Given that

substantial evidence supports the ALJ's conclusion that the VE testified reliably

regarding the number of positions available for the representative occupations she

identified, the ALJ did not err in declining to require the VE to provide her research and

date to Plaintiff's counsel.

### 5.    Plaintiff's Remaining Arguments

Plaintiff's remaining arguments veer perilously close to being conclusory and

perfunctory, such that this Court could consider them to have been waived.  *See Rice*

*v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that

'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey,* 125 F.3d 989, 995–996 (6th Cir.1997)).  However, to the extent this Court considers them, they present no basis for remand in this case.

Plaintiff argues that the ALJ's decision is inconsistent with respect to whether Plaintiff had muscle spasms and a limited range of motion of the spine.  This argument lacks merit, as the ALJ's assessment of the medical evidence on this issue is accurate:

> Findings upon physical examination did not evidence significant deterioration or abnormalities.  The record does not demonstrate clearly that [Plaintiff] has the significantly limited range of motion, muscle spasms, muscle atrophy, motor weakness, sensation loss, or reflex abnormalities, which are associated with intense and disabling pain.

(Tr. 20.)  Although the record contains isolated references to muscle spasms (Tr. 556), no physician reported that Plaintiff consistently experienced any of the conditions enumerated in the above passage.  Accordingly, the decision is not inconsistent, either internally or with the record, and substantial evidence supports the ALJ's conclusion on this point.

Plaintiff argues that the ALJ erred in failing to discuss Plaintiff's prior application for benefits, and that such failure was harmful because, while the ALJ pointed to evidence of Plaintiff's capabilities that pre-dated Plaintiff's December 2010 application, the ALJ did not make a separate RFC finding for the period before that date.  This argument lacks merit.  As a preliminary matter, in his application, Plaintiff alleged an onset date of March 1, 1995.  The ALJ declined Plaintiff's request to amend that onset date to the filing date of his prior application (Tr. 11), and Plaintiff does not challenge

26

that denial.   Further, although the ALJ did make reference to Plaintiff's activities and capabilities prior to December 2010, the ALJ made these references in the context of assessing Plaintiff's credibility.  Plaintiff's activities prior to December 2010 were only one of multiple bases for the ALJ's negative credibility finding. (Tr. 22-23.)  Further, the ALJ's decision reflects that the ALJ relied on medical evidence – the vast majority of which arises out of treatment that occurred after December 2010 – and Plaintiff's own testimony to determine his RFC.  Even if the ALJ erred in relying on information that pre-dated Plaintiff's December 2010 application date, other evidence in the record substantially supports the ALJ's conclusions in this case.

Finally, Plaintiff argues that the ALJ erred in not explaining why he omitted from Plaintiff's RFC the restriction that Plaintiff could only stand for 10 minutes and sit for one-third of the workday, despite having asked the VE whether an individual with those limitations could perform work.  Plaintiff's argument fails because he points to no legal authority requiring an ALJ to explicitly accept or reject each hypothetical he poses to the VE during an administrative hearing.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.


**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: June 26, 2013

27